W.C. Melcher, M-E-L-C-H-E-R, of Melcher, Melcher & Melcher, and my son, William Paul Melcher, of the same firm. Good morning, Your Honor. Good morning. We bid good morning to this Honorable Court. Are you Melcher or Melcher? Yes. Which one is which? Yeah. Which one from the middle or the last, Your Honor? We haven't figured out. Well, I'm the last because I'm going to be the first one to fall off. My other son is not present today. We bid good morning to this Honorable Court, and we're privileged to represent Jose Alfredo Vargas on appeal upon appointment by this court. As the court knows, we've got two totally distinct arguments here. And going right to the Booker issue very, very briefly, we're guided, of course, in this case by Booker, first of all, the United States Supreme Court, and secondly, to some extent, by Ameline II, which is the only decision thus far by this circuit. And, of course, that decision is in more or less of a state of suspension. Some of the other circuits have spoken on these issues, perhaps hastily, I don't know. But we very much appreciate and commend the court for taking its time and approaching this cautiously so that the opinion that's reached in this court may be the proper and definitive opinion. It appears clear, again, without citing Ameline II, but it appears clear to me at least that upon re-hearing and bank or hearing and bank that Ameline II will eventually form the basic opinion of this court interpreting Booker. And it appears to me that the Ameline II decision is very well reasoned. And I've read the briefs for the reconsideration in bank. We believe that upon going to the United States Supreme Court, if it does, that the court will review and view that decision favorably. So how would you like us to vote on the pending and bank request? How would I like the court to vote? I think it's I personally and honestly, I think it's I think it would be important to permit the in bank, not because we disagree with the opinion, but we believe that it should be aired aired out fully and so that every side gets a fair shot. Now, of course, it's going to probably go to Supreme Court eventually. I don't know. But we believe that this court has has been very, very cautious. And we believe that's important because I think you think the facts of this case track Ameline. That it should track Ameline. Yeah. The way the judge performed his analysis on sentencing and his factual decision. Is this on square with Ameline Ameline's facts? I think it is. I believe it is. I certainly believe it is. And eventually, I suppose maybe in this case, the court is going to come out with another opinion that's going to further define it. Now, there's other issues that are still going to be pending over time with regard to Booker. You know, for example, like what is an admission as opposed to a conviction by the jury? But in any event, we believe that Booker clearly requires remand here. But I want to point out that our second issue on appeal, we believe and very, very strongly argue that the second issue would make Booker not even necessary to be addressed. Because we believe that the second issue would require complete reversal. And that's involving the evidence admitted on cross examination of Vargas himself. This is something that's rarely seen in a trial court. I've spent 35 years as a trial attorney and criminal trial attorney and very prosecution and defense. But very infrequently, perhaps rarely do we see, you know, and I should say subsequent conduct or things that happened seven years later, try to affect something that could be brought in that affected something seven years early. And that's basically why we believe that the second issue is the most important issue in our case.     It's not just a matter of the evidence. We're not trying to make it look like ordinarily we see prior conduct. But here we see something totally remote having to do with something totally different, not even an importation case. Do I understand correctly, the judge originally ruled that the evidence was too remote? Pardon me? She initially ruled that the evidence was too remote. Oh, yes. And then she allowed it nevertheless after your guy testified. Exactly, yes. Let me assume for the sake of discussion that you've convinced us that she blew it, you know, that this evidence should not have come in. Why isn't it harmless given the fact that Vargas paid cash and small bills for a business that he didn't seem to have anything to do with? He had all this pipe that he just abandoned. It made no sense to buy it to begin with from an imported into Mexico. Well, he said he was going to take it back to Mexico. You know, that may be a stretch. You probably buy it in Mexico cheaper, you know, than you store it and send it back. But just to abandon it. Abandoned, let alone. Certainly some money was spent on storing this stuff. No doubt about it. But I think that the evidence against Vargas, you know, prior to his testifying, that is, the cross examination was very, very slim. And certainly it wasn't harmless because the court thought it was crucial. Said it should be admitted. It's crucial evidence. The prosecutors certainly thought it was crucial. Otherwise, they wouldn't have brought it up to begin with. Where do you get that the judge said it was crucial? Your Honor, we cited it in our opening brief at page 48, excerpts of record 83 to 84. The judge thought that indicated there that it was very important that this kind of thing should be brought up. But not only did the prosecution think it was very important, otherwise it wouldn't brought it up. But I think it was probably known to the prosecution at the time that they were kind of stepping out of line a little. I shouldn't say not ethically, but that they were going outside, you know, the envelope a little bit. And that if they would bring this up, maybe prior to that, there was nothing appealable. But this is the kind of thing that would certainly stand out on appeal. Mr. Malker, what do I do with the fact that when Judge Baird initially ruled on this 404B issue pretrial, she made it pretty clear that she would reconsider it if your client opened the door. Yes, she did. During his testimony that it might be admissible for impeachment purposes. Doesn't that address the question Judge Silverman asked earlier? She was initially inclined to exclude the government from admitting it as evidence in the prosecution's case. Yes. But given the fact that she apparently found through your client's testimony that he did open the door and that it was now admissible at trial for impeachment purposes, how did she abuse her discretion in doing that? Conceding but not admitting that it was something to open the door. But conceding that for a moment, what is the defendant to do when he's faced with something so horrible as a conviction? He could remain silent and not take the stand that has terrible consequences. Well, the problem was that he essentially portrayed himself, and I'm characterizing this to support the district. Law-abiding guy. Yeah, I'm a law-abiding guy. And at that point, she says to the prosecution, well, you can now introduce what he did just before he got arrested after he returned from Mexico. Sure. He showed that that statement is simply not true. He may have been a law-abiding guy. We learned. We do think sometimes we don't learn so good. And seven years later, he might have, you know, been involved. This might have been something he learned later. We don't know. It doesn't. Isn't that the standard of review of what the judge's decision on admissibility, abuse of discretion in this case? Yes, it is, Your Honor. And where did she abuse her discretion? We believe that it was an abuse of discretion since the only, you know, the most powerful inference that the jury could have found here was that he must be guilty because seven years later, under entirely different circumstances, he engaged in a cocaine sales discussion. It was way too remote in time. It wasn't admitted for character. It was admitted, as I understand it, it could be anyway, under 404B for knowledge of intent. Yes. He says, I'm an avocado farmer. I run a, I sell fish. And so the government was allowed to bring in to show the fact that this act showed that he had knowledge of what he was doing and the type of business he's in, which was exactly the same thing as was charged originally. Isn't that right? I'm not certain. Large quantities of cocaine. He was charged with importing, essentially, bringing it into the country. You offered to sell a kilo before he was dealing in tons. I mean, we're not talking about a street guy. Is there something there? I think so, Your Honor. If we take a look at it in that fashion, and I thought about that this morning, if something we do in the future can be applied to something we've done seven years in the past, could then we not be found guilty or accused of anything having to do with cocaine, whether or not we knew about it? I think the important thing was what did he, what was his knowledge, state of mind, et cetera, at the time in 1994? Not 91, 01. Are you confusing 404B analysis with regard to showing lack of mistake, accident, knowledge, and so on with what I understood the purpose of the evidence was for impeachment purposes, which is different, to show that what he said on direct examination to the jury, I am a law-abiding guy, is not true. It's impeachable by admitting evidence that shortly before he was arrested he was engaging in a drug distribution transaction. I'm not certain that is exactly what the court said. It wasn't just to catch him in a lie. It was more to show that he had knowledge, he had motive, the intent, things like that. Well, I'm looking at an excerpt of Record 515, and at that point I think there's an argument with regard to whether or not this is a proper and improper line of impeachment. And the court says, all right, I'm going to find that there is sufficient evidence that has been introduced. Let me put it this way. The defendant has testified. It's very crucial testimony, and the government must impeach the defendant in order to be able to prove their case. And I'm not sure whether she's talking about admitting it strictly for impeachment purposes or whether she's now reconsidering her prior 404B rule. I don't know that that was argued by either side, the latter, but please keep in mind that there was a jury instruction here, and I think the jury instruction or the selection of the jury instruction is instructive upon why it was. It wasn't just to show that he was a liar, you know, that two weeks ago he said, when I go to court I'm lying. Did she give the standard limiting instruction that I'm admitting this evidence solely for the limited purpose of considering the credibility of the jury? No, Your Honor. I believe it was to show intent, motive, et cetera. So she did not give a limiting instruction at the time that the impeachment evidence was introduced? She gave it at the time, wasn't it? Didn't she tell the jury right then and there? I'm not certain, Your Honor. If it's credibility, you run into our Castillo case, which seems to say that if you proclaim certain specificity, disclaim drug use, manufacture, blah, blah, then you can impeach that directly. That's the impeachment credibility issue. Here he didn't say anything about drugs. All he said was that he sold fish, he was an avocado farmer. So he didn't disclaim that he was a drug dealer, which is the Castillo first part. Castillo's second part says you can use 404B to show the knowledge, lack of mistake, whatever. Yes. I don't find the record showing exactly what the judge said here. I don't think, but I'm not sure. Except on the jury instruction. And the jury instruction was the 404B. That's correct. Yes, it was. You know, again, if this was the day after, 94, or two weeks before, that's something else. But we're talking about something so remote that, you know, and even if possibly it could have been admitted for whatever purpose, the question is should it have? And that's the abusive discretion, we believe, that it was so remote that, you know, the jury more or less thought he must be a bad guy. What about the fact that he fled to Mexico? Does that, in the interim, does that enter into the analysis at all? I don't believe so, Your Honor. I don't think there's any evidence. You know, when one goes someplace, somebody can say he went, somebody else can say he fled. Did the district court ever make a finding that he had fled, knowing that there were charges pending? Well, Your Honor, there was evidence brought up by the prosecution, Mr. Dugdale, I believe, that over a period of time he had come back numerous times. He passed through the border and he left footprints there. You know, he left evidence there that he was coming back and forth doing whatever. With regard to the speedy trial motion, which we at one time considered might be something we wanted to bring up with this court, but we didn't for very strong reasons. But in any event, we didn't think it was appealable, you know, that there was a potential issue there. But with regard to that issue, he should have been brought to trial within a certain period of time, was the argument. And the decision by the court, which we stood by, was that he absented himself. He certainly was in Mexico, no doubt about it. In fact, he kept coming back and forth doing whatever. Nothing illegal was ever shown. But I don't think he fled. Again, you might make an inference that he fled. But, you know, when one flees, he runs like hell. I'm not certain that he did that here. Any other questions? No. Thank you. Thank you so much. Thank you for a little extra time. Maybe you didn't. Well, right on 10 minutes. That's a new time. Nice try, Mr. Miller. Actually, it was four and a half minutes. Thank you. Good morning, Your Honor. Robert Dugdale on behalf of the United States of America. Good morning. At least the court. I'm acting solo today. I have no siblings with me, sons, anything. No friends from your own that could come and get an agent or something? I have one friend who's with me. In any event, Your Honor, there are the two issues, the sentencing issue and then the cross-examination issue. Regarding the sentencing issue, I'm going to spend a very short amount of time. This is a plain error case because the defense did not make a Sixth Amendment objection before the district court. Nonetheless, as the Ameline 2 court held, and again, that decision is sort of in a state of flux right now, it held that it's a truly exceptional case that will not require remand. And the government concedes this is not a truly exceptional case. The district court at the time it imposed sentence believed this, of course, it was a mandatory sentencing system and now under Booker it's clearly advisory. So the one thing the government would ask, however, is that this case be held in abeyance pending the ultimate outcome of Ameline because that may change the equation, of course. You're going to be part of a cast of thousands on being held up for remand. I understand. There must be a lot of paperwork behind that curtain there. I'm going to spend the majority of the time talking about the evidence admitted through the cross-examination to the defendant. First of all, I think it's important to note that this was a trial in which the government called 36 witnesses to establish that the defendant purchased a business which was importing cocaine by the ton between 1993 and 1994. So what this is, of course, is blown up in the course of the appeal, but this was just a sliver of what actually the evidence that was presented in the case. But the defendant, of course, testified and chose to take the stand. And as Judge Talman correctly recognized, the judge advised the defendant beforehand that there was a possibility that as a result of that decision, depending upon the way that he testified, this evidence that the judge had previously excluded or not allowed the government to present in this case in chief might be subject to cross-examination. The judge excluded it because it was too remote in time? Correct. How did it become remote in time? More remote in time a couple months later? Yeah. Well, I think the equation changed in a couple of respects. But first of all, there were several theories in which the district court allowed this evidence and several reasons why it was permissible. And the first theory was it was used for impeachment evidence. That's the Castillo problem. That's the Castillo problem, and there's another case, Antoniakis. But in any event, that has nothing to do with the remoteness of time. It's strictly this evidence being used to impeach what the defendant said and is direct. In fact, there's a case, United States v. Lopez, which the government cites in its brief, which makes it clear that time gaps between whatever the events in question are don't matter because we're talking about impeachment. So what Castillo says is basically that evidence that would otherwise be inadmissible under 403 or 404B becomes admissible if it could be used for impeachment. I'm a co-conspirator in Castillo, and the way we wrote it was that, right or wrong, it says that if you testify to the negative, i.e., I'm not a drug dealer, I hate drugs, that you could impeach with the fact that later on you did deal drugs. Correct. And that was a case where there was impeachment just as a result of an arrest, I believe. You'd have to tell me how we would follow Castillo in this case, where in this case he did not say, I don't deal drugs, I don't like drugs. He said, I'm an avocado farmer. Now, are we to distinguish Castillo and allow impeachment, or do we have to go the 404B route? Well, I think both situations can happen here. How do you get around Castillo? Did we write it too tight? Well, this is not as direct as Castillo on that particular issue, but also in Castillo, and also this in Takia's case, the defendant also testified that he was a legitimate businessman, and that was another basis for allowing that in. And that's exactly what happened here. And the question was raised, well, how was what happened in 2001 relevant? Well, the defendant made it relevant through his direct testimony. Specifically, when the defendant took the stand, he testified at length about his background, about his various jobs. I'm an avocado farmer. I'm a restaurateur. I'm a fish salesman. And he testified specifically about doing these things in 2001, and that's at page 79 and 90 of his testimony in 12-1702, which I believe is 457 and 468 of the record. You say the judge allowed this in only for impeachment. Is that your theory? Well, no. The judge actually allowed this in to impeach the defendant because she believed that the defendant opened the door. She also allowed it in under 404B and did a 403 weighing analysis, in which she said that this evidence was more probative than prejudicial to the defendant. Is counsel right that the jury instruction was a 404B instruction? That is correct. It was a 404B instruction, but I will note that the defense never requested any different instruction. In fact, it agreed with the instruction that was given. So if there was a mistake along that line, we're talking about a plain error now. Well, I'm not sure if it was a mistake or just trying to figure out what the judge's thinking was. She never said to the jury, ladies and gentlemen, this is admissible just as it bears on the defendant's credibility. Anything like that? No. I don't believe the judge did say that. That is correct, Your Honor. And the defense never requested such an instruction and never objected to the instruction that was given. Never. So that leads us to the conclusion that it wasn't impeachment. It was admitted for substantive evidence of lack of knowledge and intent. Well, but that's not exactly what the court said, though. In its ruling, the court said that she believed the defendant had opened the door to this testimony through the way that he testified. That clearly suggests it was impeachment evidence. Opened the door by testifying that I'm a legitimate businessman. And inferentially from all that, to answer your question, Judge Brunetti, is I'm not a drug dealer. I'm a legitimate businessman. I'm an avocado farmer. I'm a fish salesman. All of this. And again, this is being brought through the defendant's own testimony up to 2001, which is the year where this event took place here. Tell me again how it could be. First she rules it's too remote in time, and then she rules that it's not. She doesn't really say whether it's too remote in time or not. She just lets it in. Correct. That's a little perplexing to me. I understand that particular point, Your Honor. Again, impeachment's totally a different issue. But when we get to 404B and 403, what made this more probative, of course, is the defendant took the stand. So there's a 403 component. If it's remote, it's remote. That's correct, Your Honor. But when there's a 403 component to 404B, in pretrial, you know, there's nothing the defendant hasn't testified. He hasn't put his knowledge front and center stage like he did when he testified in the trial. So the equation changes when he takes the stand. The 403 analysis changes. Was the fugitive status known at the time they ruled on the pretrial motion? It was, Your Honor, because there was a pretrial motion made by the defense to dismiss the case on the grounds that there was a delay in prosecution. And there was a hearing, and the government offered evidence to show that he was a fugitive. That's why there was a delay in prosecution. And the defense offered evidence to show that he would periodically come back to the United States. And the court ruled that, in fact, the defendant was a fugitive, and that caused the delay. So, and that also goes to the point on the time length here, is there's a couple things to mitigate against the seven-year time gap here, which would make this evidence admissible under 404B. Mr. Dugdale, the problem that I'm having, and it sounds like from the questioning my colleagues are troubled by it, is there anything more in the record besides this colloquy at the government's excerpts of record 515 and 516 where Judge Barrett explains why she's now going to admit this evidence in light of how the defendant has testified? Because I find her wording to be somewhat ambiguous. I can't tell whether she's saying, I'm admitting it for impeachment purposes or I'm going back and reconsidering my prior 404B ruling. And I now find, based on the way that the defendant has testified, that it is admissible to show knowledge. I mean, she sort of mixes the two up, and I'm having a difficult time figuring out what the purpose was of admitting this. Your Honor, I believe there was another instance where she did a 403 weighing, which is apart from that. Can you give me a record cite? I hopefully can. All right. I will look at it in a record cite. All right. If you want to send us a letter afterwards. No problem at all, Your Honor. But I believe they're both cited in the brief. Well, let me ask you this. How did the 404B jury instruction come about? Somewhere along the line, either it just slipped in, or the parties acknowledge this was a 404B, or the judge did something. I mean, I haven't read the record. But if you came up with a 404B instruction, how did that come into the jury? The parties agreed to give that limiting instruction. And this also goes to the harmless error analysis, of course. The defense's whole argument is that this was just propensity evidence, and that the jury must have concluded he did it in 2001, therefore he did it in 1993. Okay. But your argument is no, it was legitimate impeachment. And we're pressing you here trying to figure out if it was legitimate impeachment, why didn't the court give an impeachment instruction or a contemporaneous limiting instruction to the jury? I'm going to allow evidence of his street drug dealing in Indianapolis, not for purposes of showing that he's a drug dealer, but to impeach his testimony that he's an avocado farmer. It was not requested. I guess that's the reason why it was not. So neither party requested it. That's correct. The defense did not request such an instruction, and the government didn't either, and the court's response didn't give such an instruction. But in any event, I believe that this opening the door language that Judge Barrett made makes this less ambiguous, talking about how the way he testified allows us to examine him about this because he opened the door to it. That's exactly the type of thing that was at issue in Castillo, which is an impeachment case, of course. Well, the balancing test required by 404B may or may not have been done, from what I understand, and I haven't read the record. It's an issue of law that we're going to have to look at, right? That's correct. So we can look at the record to determine from whatever's in the record whether it was an abuse of discretion to allow 404B. You have not challenged the jury instruction, so they can't go there. Yes, sir. And that, as you said, leads us to harmless error. Correct. In the harmless error analysis, again, this is a case, 35 witnesses who testified, overwhelming evidence. The particularly damaging evidence, of course, being that pipe that was thrown in that storage facility that was used to conceal the prior shipments of cocaine. And, in fact, in one storage facility, there were X-Acto knives, there were fiberglass tires, or a piece of fiberglass tires similar to the tires that were used to conceal the cocaine, and that was all in the storage locker. The defendant read it out. That was particularly devastating evidence. Couple that with his fugitive status, the very suspect nature in which he purchased this business of $50,000 in cash and small bills. In fact, he tried to put it in somebody else's name, who had no association with the business. And, of course, other things that he testified about, completely apart from this, which made his testimony clearly unbelievable and easily impeached and non-believed by the jury. Excuse me. As I understand the impeachment, to make it in this remoteness and materiality and whatever, check me if I'm wrong. It seems to me that the undercover agent asked to buy a small amount of cocaine. That's correct. As I understand it, the defendant then offered to sell him one kilo. That's correct. Which would not be a small amount, which would be more in keeping, as I take it, I don't know if it was in the record or argued, to what he was doing before as dealing in tons. Correct. Is that the whole point here? I'm not sure. Well, the whole point was because in the conversation, he expressed a knowledge, a familiarity with drug trafficking, which he knew things about cocaine. He knew the price of cocaine per kilo, depending upon its purity. He knew about how to use couriers and how that worked into the pricing scheme and everything else. So his knowledge was a central issue in the case. And when he testifies, it must be a case where the government can ask questions. What do you know about cocaine? What do you know about the price of cocaine? But that is classic 404B evidence in order to show knowledge. It's not impeachment. That's the problem I'm having. I guess the issue is that the court, what the court, I think, when she blended both these concepts in, really allowed it for both purposes, really allowed it to impeach and also under 404B. And, again, what changes the equation is when he testifies, when he puts his knowledge in the forefront and when that becomes a central issue in the case, his credibility and his knowledge. Well, if it's a legal issue whether 404B applies, that's our ballgame. If it has to have factual determination below, that may be a problem. Is there enough facts in the record for us to examine the legal issue on a 404B analysis? And, again, related again to the harmless error, there's a seven-year gap. However, that can't completely destroy the probative value of what's going on here, given the particular knowledge that he demonstrates here. And, of course, that seven-year gap can be discounted a little bit, too, because But as Mr. Melker points out, you know, in the standard case, the bad conduct occurred seven years before the conduct that the defendant is being tried. Here we have just the converse, which to me is a harder case. You want to prove that by virtue of his conduct seven years after the acts charged in the indictment, that must have meant that seven years earlier he knew what he was doing when he was trafficking in huge quantities of cocaine. Well, again, given the substance of what he's talking about seven years later, I think it would be naive to believe that it was exactly seven years later he picked up all this knowledge about the amount that cocaine costs and how this all works. So it's really not a seven-year gap. That just happens to be when the conversation occurs. And, of course, under the United States v. Martinez, that gap can be closed a little bit here because he's a fugitive the entire seven years. The government has no way of showing and there's no way to show what's going on in that seven years. What do you say he was a fugitive? Was there a warrant out for him? Yes. There was a warrant out for the defendant in 1995. He disappeared and he went to Mexico. And particularly what happened is he disappeared as soon as his roommate and nephew, who he left in charge to run the business, and all the cocaine of this business that he purchased for that $50,000 cash was seized. He immediately disappeared to Mexico. The next time he showed up was in Indianapolis when he was intercepted over wiretaps. Mr. Melcher said he was crossing the border all the time. Well, I believe that is sort of unclear. He had a mother who was in a hospital in San Diego. And there was some testimony he testified that he crossed the border a couple of times and he just wasn't apprehended at that point in time. We don't know how he crossed the border or how this happened. But in any event, the next time he was picked up by the government was over these wiretaps. And, again, the one thing the judge did here was show a great deal of restraint on the amount of this 404B or impeachment evidence she let in. In the pretrial hearings, the government, you know, sought to introduce evidence of his co-conspirators in Indianapolis testified, introduce wiretap calls. It was very particularly aimed at this conversation in which he discusses the price of cocaine and demonstrates the knowledge that one would have if one were dealing with cocaine. So it was very particular. That's another reason why this was harmless error, if it was error at all, because the evidence was extremely focused. Thank you, Mr. Melcher. Mr. Melcher? Your Honor, very, very, very briefly. You forgot your son. I'm sorry? I think he's much more prepared to argue the case than I am. However, he's had this recent surgery. Yes, there was a warrant, and he was so-called fugitive because the warrant was not executed, but there was no effort ever made to execute the warrant. And when he crossed the border a number of times for whatever purpose, to visit his mother or otherwise, he was never – there's no showing that he knew that there was a warrant, except, as counsel said, that it was soon after his one nephew was arrested that he left. But I'm not – you know, who knows who has – Let me summarize what Mr. Dugdale says. Basically, there's no innocent explanation for what Vargas did with getting this pipe and storing it in the way he did, the way he acquired the company and the whole ball of wax. Can you refute that? Oh, I think there's certainly – I think he – I think his testimony was – could lead a jury to believe that there was an innocent explanation for it. Now, whether or not one would determine that, you know, that he was telling the truth, he didn't testify that he got – that he brought this stuff in and stored the pipe because he wanted – you know, that – because he brought in cocaine. He said he saw the pipe there and he didn't want to throw it out. He was, you know, very economical in that regard. He stored it. He was going to take it to Mexico to grow plants. So I think that's an innocent explanation. It might not be the best. He abandoned it, right, for nonpayment of the storage? Yes, yes. Do you think he confessed to smelt this? No. No, I'm not certain that it could. But, again, the jury was entitled to look at it both ways. There was very, very thin evidence, you know, to show that. And this purchase of the business, I'm not certain, was so suspicious. There was this – he testified it was this other person who wanted to buy it and he acted as the go-between, et cetera. He never went there. Very, very rarely went there. And as far as this seven-year-later conduct, hopefully we will all know things seven years from now we don't know now. And that shouldn't be held against us if it's criminal. Criminal intent we have seven years from now in order to show we didn't. When we do approve under unlimited circumstances post-crime evidence under 404B. Yes. I mean, there is some case law that says. Yes, Your Honor, there certainly is. It would be considered an inappropriate case. The question is whether seven years is pushing it beyond the edge of the envelope. And also in this case, as I think Your Honor pointed out, if it was admissible evidence originally during the government's case in chief, it would have been admitted at that time. Judge Baird would have permitted it to be. There's still knowledge. Except that we have the line of cases that says you have to balance the four factors, one of which is the temporal factor. Yes. And apparently Judge Baird did that pre-trial and said, I find that's too long and I'm not going to allow it in for 404B purposes. But I'm warning you, depending on how you testify, it may come in for impeachment purposes. How did it improve temporally, though, would be my question over. I'm not sure that it has to. I guess that's the question that we're wrestling with. If it's admitted for impeachment purposes, it doesn't matter that it was seven years later. I'm not certain that it tended to impeach or that was the reason it was admitted. It was, you know, the 404B reason as shown in the jury instruction. And, you know, when you're in trial, you have to make decisions. And decisions are made in the spur of the moment, not only by the attorneys, but by the court. And if that is wrong and unduly prejudiced the defendant, then it should be reviewed by this court as it is. And it should be sent back. I can't issue, I can't give an opinion as to whether or not a retrial without this seven-year-later testimony would result in a conviction or not. I don't know. But isn't that what we have to consider in looking at harmless? Yes. Yes, we certainly do. But I'm just pointing out along the way that this was so unduly prejudicial. Seven years later, with regard to showing what knowledge he may have had seven years earlier, and it just doesn't pass the smell test. Okay. I think it's all a matter of fairness. What is fair? Forgetting all the legal principles, is it right? And that's how I look at cases. I keep looking for that button on my computer, but I haven't found it. Thank you. Maybe someday. It's always a great pleasure to appear before this court. Thank you for your argument. And the U.S. Attorney's Office. Very enjoyable. Thank you. I don't mean to eat up any more time. I know I went over as it was. But there's common assets. You got a cite for me? Record cites. Why don't you just give us the cites and not any more argument if you would. Okay. This is going to be really hard. But in any event. All you have to do is say a number. Yes. Call it. They don't want to be on. That's the way the game is played here. 479 to 485 was the first ruling. And then the ruling which he talked about, the impeachment, was in the 403 weighing was 515 to 516. Thank you very much. Thank you, Your Honor. The case was argued and submitted. We'll stand and recess. All rise. This court for discussion is adjourned. Thank you.
judges: Brunetti, Silverman,tallman